IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 2:12cr55 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| ERIC H. MENDEN, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING

The United States of America, by and through its undersigned attorneys, offers the following with respect to the sentencing factors under both the United States Sentencing Guidelines and 18 U.S.C. § 3553(a). It is the government's position that the sentence of 180-months imprisonment is reasonable and warranted. If necessary, the government intends to call Special Agent Andrew C. Bowers, Internal Revenue Service, to present evidence at the sentencing hearing. In support of its position, the government states as follows:

**I.      BACKGROUND FACTS**

On April 20, 2012, defendant Eric H. Menden pleaded guilty to a three-count criminal information charging him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, false statements in violation of 18 U.S.C. § 1001, and conspiracy to commit bank fraud in violation of 18 U.S.C. § 371. The Statement of Facts (Doc. 9) described in great detail the factual circumstances underlying defendant's crimes. The conspiracy to commit wire fraud and false statements charges arose from defendant's participation in a large-scale historic tax credit fraud scheme aimed at defrauding corporate investors, the United States and the Commonwealth


of Virginia. The conspiracy to commit bank fraud charge relates to defendant's fraudulent relationship with Bank of the Commonwealth ("the Bank") insiders whereby defendant and his business partner, George P. Hranowskyj[1], did favors for Bank insiders in exchange for favorable treatment to the detriment of the Bank.

The Honorable United States Magistrate Judge Tommy E. Miller accepted defendant's plea of guilty, and scheduled a sentencing hearing for July 23, 2012. Defendant's sentencing hearing was continued, and is currently scheduled to take place before the Honorable United States District Judge Raymond A. Jackson on September 26, 2012.

## II.     STANDARDS GOVERNING SENTENCING

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85, 128 S. Ct. 558, 564 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence"). In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. The Gall Court further instructed

---

[1] In a related case, on July 11, 2012, defendant's business partner, George P. Hranowskyj, also pleaded guilty to engaging in wire fraud and bank fraud. See United States v. George P. Hranowskyj, 2:12CR58.

that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one.").

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence." United States v. Simmons,269 Fed. Appx. 272, 2008 WL 681764, at *1 (4th Cir. March 11, 2008) (citing United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007)). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Cuthrell, No. 12-4077, 2012 WL 3643677, *1 (4th Cir. Aug. 27, 2012) (citing United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009)). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

## III. THE ADVISORY GUIDELINE RANGE

The government maintains that the appropriate advisory guideline range is 210-262 months. As discussed below, the probation office calculated defendant's advisory guideline range at 292-365 months. Defendant has objected to the application of a 4-level enhancement for a leadership role, a 2-level enhancement for obstruction of justice, and the failure to reduce his guideline range by 3 points for acceptance of responsibility. The government disagrees with defendant and believes that the leadership and obstruction enhancements have a factual and legal

basis. However, the government and the defendant agree that his advisory guideline range should be reduced by 3 points for acceptance of responsibility. This results in an advisory guideline range of 210-262 months.

### A. The Pre-Sentence Report

The probation office calculated defendant's advisory guideline range as 292-365 months. Defendant's base offense level is 6 pursuant to U.S.S.G. § 2B1.1(a)(2). The probation office concluded that the following enhancements applied:

- 22-level enhancement for a loss more than $20,000,000 (U.S.S.G. § 2B1.1(b)(1)(L));

- 2-level enhancement for sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C));

- 4-level enhancement because the conduct substantially endangered the solvency or financial security of a financial institution (U.S.S.G. § 2B1.1(b)(15)(B));

- 4-level enhancement for being an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (U.S.S.G. § 3B1.1(a); and a

- 2-level enhancement for obstruction of justice (U.S.S.G. § 3C1.1).

The application of these enhancements results in an adjusted offense level of 40. The probation office did not reduce defendant's adjusted offense level by 3 points for acceptance of responsibility. Defendant is in criminal history category I. According to the probation office, defendant's advisory guideline range of 292-365 months imprisonment.

### B. Defendant's Objections Are Without Merit

Defendant's objections to the 4-level enhancement for leadership role and the 2-level enhancement for obstruction of justice have no factual or legal basis. Importantly, defendant does not deny the facts outlined to support the basis for these enhancements. Instead, defendant argues that there are factors that should mitigate the application of these enhancements.

Defendant is wrong.

### 1. The Four-Level Enhancement for Leadership Role Is Appropriate

The 4-level enhancement for defendant's role in the offense arises "where the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The Application Notes outline the factors that the Court should consider when determining whether a defendant is an organizer or leader including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity and the degree of control and authority exercised of others." U.S.S.G. § 3B1.1(a), app. note 4. The application of this 4-level enhancement clearly applies to this defendant who, along with his business partner, managed and controlled at least twenty-five limited liability companies, recruited and directed accomplices to create false documents to support the wire and bank fraud schemes, who duped an accountant and two individuals employed by a tax credit broker into facilitating the wire fraud, and who split the substantial proceeds of his offenses with his partner. (PSR ¶¶ 7, 19).

Defendant does not contest the factual basis for the application of this enhancement, but instead argues that a 4-level enhancement is excessive because Bank insiders were involved in his crime. While defendant correctly notes that he did not have the keys to the Bank's vault, the fact that his conspirators were high-level Bank officials does not negate defendant's leadership role within his own criminal enterprise. The facts unequivocally demonstrate that defendant was a leader of criminal activity that was extensive. Accordingly, the application of the 4-level

enhancement for being a leader of criminal activity is supported by a preponderance of the evidence and is appropriate. The government submits that this objection should be overruled.

### 2. The Two-Level Enhancement for Obstruction of Justice is Appropriate

The 2-level enhancement for obstruction of justice applies if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conducted related to (A) the defendant's offense of conviction and any relevant conduct . . . ." U.S.S.G. § 3C1.1. The Application Notes provide the following examples of covered conduct that are directly on point: "threatening, intimidating, or otherwise unlawfully influence a co-defendant, witness or juror, directly or indirectly, or attempting to do so" and "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, app. notes 4(A) and (C). Here, defendant engaged in both types of covered obstructive conduct.

The undisputed facts are that, prior to cooperating in this matter, defendant willfully engaged in two attempts to obstruct the ongoing criminal investigation. First, defendant participated in a meeting during which he and Mr. Hranowskyj attempted to convince an employee intimately connected with the wire and bank fraud schemes to flee the country. (PSR ¶ 82). This meeting occurred after federal investigators had contacted the employee to question the employee about historic tax credit fraud and bank fraud – the charges at issue in this case. (Id.). As such, this conduct, by itself, justifies the application of the 2-level enhancement because it falls squarely into conduct covered under Application Note 4(A). U.S.S.G. § 3C1.1, app. note

4(A); see also United States v. Alexander, 53 F.3d 888, 890-91 (8th Cir. 1995) (upholding application of obstruction enhancement because defendant's financing a witnesses' flight from justice "was analogous to asking a witness not to cooperate").

Second, defendant also prepared a letter containing false representations regarding bonuses purportedly paid to the same employee in a further attempt to obstruct justice. (PSR ¶ 82). The employee gave the letter to counsel who – without knowledge of the materially false information – then presented the letter on July 19, 2011 to the United States Attorney's Office as a defense to potentially fraudulent conduct. (Id). Again, this conduct supports the application of the 2-level enhancement because defendant produced a false document during an official investigation. U.S.S.G. § 3C1.1, app. note 4(c); see, e.g. United States v. Harper,442 Fed. Appx. 857, 2011 WL 3585065 (4th Cir. Aug. 16, 2011) (affirming application of 2-point obstruction enhancement where defendant convinced others to write false letters to present at sentencing).

Contrary to his assertion, there is a substantial legal foundation for the application of the 2-point enhancement for obstruction of justice. The facts are undisputed. In short, the government has demonstrated by a preponderance of the evidence that the 2-point enhancement is warranted, and this objection should be overruled.

    C.    **The Defendant Is Entitled To A 3-Level Reduction for Acceptance of Responsibility**

Pursuant to U.S.S.G. § 3E1.1, the government and defendant agree that defendant is entitled to a 3-level reduction for acceptance of responsibility. The probation office withheld the 3-level reduction for acceptance of responsibility because Application Note 4 to § 3E1.1 provides that conduct resulting in an obstruction enhancement ordinarily indicates that the defendant has

not accepted responsibility for his criminal conduct. U.S.S.G. § 3E1.1, app. note 4. However, the note also provides that there may be "extraordinary cases" in which a defendant who obstructs justice may also get acceptance of responsibility. Id. The government submits that this is an extraordinary case in which the defendant should be entitled to a 3-level reduction for acceptance of responsibility.

On August 5, 2011 – approximately three weeks after defendant wrote the above-referenced letter containing false statements – defendant walked into the United States Attorney's Office and freely admitted his involvement in two sophisticated wire and bank fraud schemes. Defendant was honest and candid with federal investigators during this initial meeting, and he has continued to cooperate with this investigation for over a year. Defendant's level of cooperation has been extraordinary, and he has demonstrated sincere remorse for his involvement in these crimes. On April 20, 2012, defendant accepted full responsibility for his conduct by pleading guilty to three federal charges and exposing himself to fifteen years imprisonment. The government fully intends to call defendant as a witness at the trial of his conspirators in the bank fraud that is scheduled to begin on January 8, 2013. In short, the government believes that defendant qualifies for a 3-level reduction for acceptance of responsibility as he has clearly demonstrated acceptance of responsibility for his offense. U.S.S.G. § 3E1.1.

To conclude, the government maintains that defendant's adjusted offense level is 37, and his advisory guideline range is 210-262 months imprisonment.

IV.    18 U.S.C. § 3553(a) FACTORS

A sentence of 180-months imprisonment is reasonable and appropriate in the instant case. As discussed below, the application of the 3553(a) factors – in particular the nature and

circumstances of the offenses and the need to promote adequate respect for the law – support the highest possible sentence in this case. The government respectfully submits that defendant should be sentenced to 3 consecutive terms of 60 months imprisonment for each of the crimes he has committed.

### A. Nature and Circumstances of the Offense

The nature and circumstances of defendant's offenses are egregious for several reasons. First, the schemes to defraud were incredible in their sophistication. The historic tax credit scheme was based on the systematic falsification of invoices for large construction projects. Creating fraudulent invoices and other documents was a full time job for a conspirator. These forgeries were so convincing that they duped an accountant at an accounting firm that specializes in preparing certifications for historic tax credits and the principal employees for the tax credit broker. In some instances, Menden and Hranowskyj turned the mere prospect of historic tax credits into millions of dollars in their bank accounts.

The bank fraud scheme was equally as elaborate. The reciprocal relationship was effectuated through various creative banking methods. For example, the Bank insiders did not simply finance a new loan to Menden and Hranowskyj to enable them to purchase Troy Brandon Woodard's personal condominium. Instead, Bank insiders increased the principal on two existing loans and wired over $350,000 to the title company to give them the "cash" with which to purchase the property. When Bank insiders did not want to take a loss on a warehouse located at 1001 Monticello Avenue, they dispatched defendant to the auction, he bid up the property to the suggested value, and the Bank insiders facilitated another loan from the Bank to purchase the property. And, after defendant spent over $17 million purportedly renovating 345 Granby

9

Street, the Bank insiders permitted defendant and his partner to continue to fund construction by overdrawing their bank accounts by over $600,000. The sophisticated nature of this scheme is extraordinary.

Second, these schemes are unusual because they took place over such a long period of time. Defendant maintained a charade of legitimacy for years propped up by fraudulent loan proceeds and fraudulent tax credits. It is stunning that defendant never stopped to question his illegal activities during the five years he engaged in the tax credit fraud and the three years he engaged in bank fraud. Instead, defendant repeatedly engaged in the same pattern of fraudulent activity for years until he finally learned of the government's investigation.

Finally, the loss amounts of both schemes are staggering and the collateral consequences unmeasurable. Defendant and his business partner received over $8 million from defrauded corporate investors for fraudulent historic tax credits. The United States suffered a loss of $6,222,097 representing the amount of fraudulent tax credits taken by an unsuspecting corporate investor. The Commonwealth of Virginia suffered a loss of approximately $6,287,004 representing the amount of fraudulent tax credits taken by numerous defrauded corporate investors. These are the losses related solely to the wire fraud.

As a result of the illegal reciprocal relationship established between defendant and Bank insiders, defendant and Hranowskyj procured over $35 million in loans during the time period of the conspiracy alone. That is more money than the average person could ever dream obtaining during a lifetime. It is no wonder that employees sometimes referred to the Bank of the Commonwealth as "the Bank of Eric and George." After reducing the principal on the loans by the value of the collateral, the loss to the Bank is still over $20 million. In short, these loss

amounts are astronomical.

The collateral consequences of defendant's crimes are no less serious. There is simply no doubt that defendant's conspiracy with Bank insiders was a contributing factor to the collapse of the Bank of the Commonwealth. The FDIC estimates that the Bank's closure will cost the deposit-insurance fund approximately $260 million. After the FDIC placed the Bank into receivership, approximately 12 bank branches were permanently closed, and a large number of employees lost their jobs and had to locate new employment in this difficult economy. Southern Bank, the financial institution that purchased a majority of the Bank's assets, and the FDIC have inherited a portfolio of loans where the remaining principal substantially exceeds the current fair market value of the collateral. For example, the loan financing the rehabilitation of 345 Granby Street has a remaining principal balance of approximately $16 million, yet the liquidation value of that property is just over $2 million. The liquidation of these assets – including approximately 70 homes and commercial properties in the Suffolk area – undoubtedly will have an impact on property values in the Hampton Roads area.

Simply put, this is not the typical white collar fraud case. Instead, defendant's crimes have had a devastating impact on the Hampton Roads community and should result in a substantial sentence.

### B. History and Characteristics of the Defendant

Defendant possesses many characteristics that weigh in his favor; however, this factor also supports a 180-month sentence. As discussed above, on August 5, 2011, defendant walked into the United States Attorney's Office, unsolicited, and voluntarily disclosed his involvement in two gigantic fraud schemes. Since that time, defendant has cooperated with the government

and he will continue to do so. Defendant was the first principal target to accept responsibility for his involvement in the bank fraud scheme, and he has demonstrated true remorse for his criminal conduct.

However, for years, defendant knowingly and willfully engaged in two extremely serious, sophisticated fraud schemes. While defendant only has a 10th grade education, he was able to pull himself out of poverty by developing an expertise in construction. Prior to his involvement in these schemes, defendant was a successful businessman. Defendant owned his own construction company, and he was making a good living doing what he loved. Defendant could have chosen to live a law abiding life; instead he selected a different path. In short, defendant's history and characteristics support a 180-month sentence.

### C. Promote Respect For The Law

A maximum sentence also will promote respect for the law. The Federal Historic Preservation Tax Incentives program and the Virginia Historic Rehabilitation Tax Credit program encourage private sector investment in the rehabilitation of historic buildings. The goal of these programs is to enrich the community by maintaining connections to our history and heritage. Defendant made a mockery of these programs. Defendant and his partner exploited these programs for their own personal financial gain. A 180 month sentence is necessary to maintain the integrity of these tax credit programs.

Moreover, a 180 month sentence is necessary to promote respect for the laws governing our financial institutions. There are consequences when customers and Bank insiders form illegal agreements to benefit themselves over the interests of the financial institution and its owners – the shareholders. Defendant's agreement to perform personal and professional favors

for Bank insiders in exchange for lower interest rates, lax loan terms, unfettered access to credit, and no limitations on overdrafts exposes the ugly underbelly of the Bank of the Commonwealth. The laws governing banking institutions seek to prevent precisely this type of manipulation for personal gain. A 180-month sentence is necessary to promote respect for the law.

### D. Adequate Deterrence to Criminal Conduct

A sentence of 180 months is necessary to adequately deter future criminal conduct. While the government does not expect defendant to engage in any crimes in the future, the government submits that a substantial sentence is necessary to deter other defendants from engaging in wire fraud related to historic tax credits and bank fraud. Because the federal and state historic tax credit programs give developers a credit equal to 20% and 25% of the rehabilitation costs, there is a substantial incentive to spend as much as possible on the purported rehabilitation. A significant sentence will send the message to developers that they need to resist the temptation to inflate rehabilitation costs and falsify invoices or they will suffer serious consequences.

Also, a sentence of 180 months will deter customers from engaging in illegal reciprocal relationships with Bank insiders. Defendant likely will argue in mitigation for his crimes that he justified his actions because he performed favors at the behest of Bank insiders. However, this argument has no merit. The personal interests of Bank insiders are not tantamount to the interests of the Bank. Indeed, in this case, the interests of Bank insiders were diametrically opposed to the Bank's interests, and resulted in substantial harm to the Bank. As such, a sentence of 180 months will adequately deter bank customers from performing favors for bank insiders.

### E. Restitution

Finally, the government will ask this Court to order defendant to pay over $30 million in restitution to the victims of his crimes.

## V. CONCLUSION

For the foregoing reasons, the Government submits that a sentence of 180-months imprisonment is reasonable and warranted.

Respectfully Submitted,

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: _____/s/_____
Melissa E. O'Boyle
Assistant United States Attorney
Virginia State Bar No. 47449
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address - melissa.oboyle@usdoj.gov

_____/s/_____
Katherine Lee Martin
Assistant United States Attorney
Attorney for the United State
United States Attorney's Office
Main Street Centre
600 E. Main Street, Suite 1800
Richmond, Virginia 23219-2447
Phone: (804) 819-5400
Fax: (804) 819-7417
katherine.martin@usdoj.gov

                /s/
-------------------------------
Uzo E. Asonye
Assistant United States Attorney
Attorney for the United State
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Fax: (804) 819-7417
uzo.asonye@usdoj.gov

CERTIFICATE OF SERVICE

       I certify that on September 19, 2012, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Fernando Groene
Post Office Box 2152
Williamsburg, Virginia 23185
groenelaw@yahoo.com

       I further certify that on September 19, 2012, I caused a true and correct copy of the foregoing to be mailed to the following:

Jeffrey A. Noll
Senior U.S. Probation Officer
1001 Omni Boulevard, Suite 300
Newport News, Virginia 23606

                              NEIL H. MACBRIDE
                              UNITED STATES ATTORNEY

By:       /s/
        Melissa E. O'Boyle
        Assistant United States Attorney
        Virginia State Bar No. 47449
        Attorney for the United States
        United States Attorney's Office
        101 West Main Street, Suite 8000
        Norfolk, VA 23510
        Office Number - 757-441-6331
        Facsimile Number - 757-441-6689
        E-Mail Address - melissa.oboyle@usdoj.gov